# THE BULLIS SCHOOL ET AL. *v.* JOHN J. JUSTUS, JR.

[No. 1354, September Term, 1976.]

*Decided September 16, 1977.*

424

The cause was argued before GILBERT, C. J. and DAVIDSON and MELVIN, JJ.

*Arthur V. Butler*, with whom was *William E. Hewitt, Jr.* on the brief, for appellants.

*William J. Rowan, III*, with whom were *Heeney, McAuliffe, Rowan & Abell* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

In July 1973, the appellee, John J. Justus, Jr., sustained an accidental injury to his right leg (knee) arising out of and in the course of his employment with the appellant, The Bullis School. Proceedings before the Workmen's Compensation Commission resulted in an award for permanent partial disability ("50% loss of use of the right leg (knee)"). Dissatisfied with the award, Justus appealed to the Circuit Court for Montgomery County, where he claimed that the accident resulted in his permanent total disability and not merely a permanent partial disability of his right leg. The case was tried before a jury (Judge John J. Mitchell presiding) on two issues. Issue No. 1 was: "Is John J. Justus, Jr. permanently and totally disabled as a result of the personal injury to his right leg arising in and out of the course of his employment on or about July 25, 1973?" The jury's answer was "YES".

In this appeal, the appellants (The Bullis School and its insurer) contend that Judge Mitchell committed reversible error in four respects:

1. "The trial court erred in denying appellants' motion for a directed verdict and submitting the case to the jury on the issue of permanent total disability.

2. "The trial court committed reversible error in allowing the testimony of a non-treating physician.

3. "The trial court committed reversible error in allowing the testimony of a non-treating lay vocational rehabilitation expert.

4. "The court erred in instructing the jury on permanent total disability".

### Directed Verdict

Appellants contend that the evidence was not legally sufficient to warrant a finding of permanent total disability and that issue should, therefore, not have been submitted to the jury. We disagree.

It is well settled that in workmen's compensation cases, as in other civil cases, the courts apply the general rule that before a motion for a directed verdict can be granted against a claimant, the court must assume the truth of all the evidence and fairly deducible inferences therefrom tending to sustain the claim. If there is any evidence from which a rational conclusion favorable to the claimant may be drawn, the weight and value of such evidence should be left for the consideration of the jury. *Superior Builders v. Brown, Inc.*, 208 Md. 539, 119 A. 2d 376 (1956); *see* also *Jewel Tea Co. v. Blamble*, 227 Md. 1, 174 A. 2d 764 (1961); *Richard F. Kline, Inc. v. Grosh*, 245 Md. 236, 226 A. 2d 147 (1967); *Ackerhalt v. Hanline Bros., Inc.*, 253 Md. 13, 252 A. 2d 1 (1969).

In *Dent v. Cahill*, 18 Md. App. 117, 305 A. 2d 233 (1973), Judge Gilbert (now Chief Judge) cited and followed the dicta set out by the Court of Appeals in *Babcock & Wilcox, Inc. v. Steiner*, 258 Md. 468, 265 A. 2d 871 (1970), and held it to be a correct statement of the Maryland law on permanent total disability. The dicta referred to is found at pp. 473-474 of *Babcock & Wilcox* where the Court of Appeals, speaking through Judge Finan, said:

"Professor Larson has an excellent discussion of

the meaning of 'total disability' in 2 Workmen's Compensation Law, § 57.51:

> "Total disability" in compensation law is not to be interpreted literally as utter and abject helplessness. Evidence that claimant has been able to earn occasional wages or perform certain kinds of gainful work does not necessarily rule out a finding of total disability nor require that it be reduced to partial. The task is to phrase a rule delimiting the amount and character of work a man can be able to do without forfeiting his totally disabled status. The rule followed by most modern courts has been well summarized by Justice Matson of the Minnesota Supreme Court in the following language:
>
>> "An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled." (*Lee v. Minneapolis St. Ry.*, 230 Minn. 315, 41 N.W.2d 433, 436 (1950).
>
> See also *Kline, Inc. v. Grosh*, 245 Md. 236, 246, 226 A. 2d 147 (1965), and *Petrone v. Moffat Coal Co.*, 427 Pa. 5, 233 A. 2d 891, 893-894 (1967)."

Applying the above principles to the evidence in this case, we think the motion for directed verdict was properly denied. The record reveals that Justus, age 44, dropped out of school after beginning to repeat the seventh grade. He has "a problem" with reading and writing. Sometime after leaving school, he worked at a gasoline service station for eighteen years, pumping gasoline and making minor mechanical repairs to motor vehicles. He then "went on the

Maryland Park Police", where, according to the testimony of one witness, "he was transferred about quite a bit in an effort to find a job that he could do satisfactorily, and after three years of this he was so embarrassed that he quit". After that he was "a maintenance man" for a cemetery ("Digging graves, putting markers in, cutting grass") for approximately two and a half years when he quit because he couldn't get along with the foreman. About 1971, he was hired by The Bullis School "to drive a school bus in the morning and in the afternoon and in between time he was to do general custodial and maintenance work". In addition, he performed janitorial duties at night in the school's classroom building.

The accidental injury, in July 1973, occurred when his right knee was cut by the blade of a rotary lawn mower at the school. The knee was severely damaged, necessitating four operations, and resulting in his having to wear a leg brace most of the time. His knee pains him "continually" and frequently "gives way" on him even while wearing the brace. He is unable to extend his leg and walks with a limp. There is medical evidence that the pain and loss of mobility are permanent and will increase as he gets older. As a result of the accident he has developed osteomyelitis in the knee, a condition described as a "permanent" "infection and drainage from the bone" caused by bacteria having "gotten in the bone itself". There is further medical evidence that he cannot stand for periods beyond "an hour, an hour and a half at a time". After that period of time, "[h]e would have to sit down or stop doing what he is doing . . . for as much as two, three hours, sometimes longer if he began to get swelling in the area before he could go about doing what he would have to do".

Justus returned to The Bullis School in April, 1975, but because of his condition was unable to perform any of the duties for which he was originally employed. The school, nevertheless, kept him on its payroll as a "maintenance supervisor" to supervise the work of the two employees who were hired after his accident in July 1973. His wife testified that he was not "able to do the supervisory work . . . . I

do most of the work like climbing the ladder. I go out and cut the grass for him. I try to help him in all his work . . . . He works an hour a day and comes in and rests. He can't keep it up. He's so weak all the time". At the time of the accident in 1973, Justus weighed 189 lbs, and was in "A-1 health". At the time of trial he weighed 139 lbs.

Two of the school's answers to interrogatories, introduced in evidence, lend substance to appellee's argument that, considering his condition, the job of "maintenance supervisor" was "created" for him by the school under a "special set of circumstances":

> "5. Provide a detailed statement of your contention as to the type of employment Claimant is capable of obtaining and the facts upon which you base your contention.
>
> ANSWER: At the present time, The Bullis School has Mr. Justus working as a supervisor for new employees who have been hired to take over jobs that he was responsible for prior to the accident. *The Administration at The Bullis School does not have any high hopes of the Claimant obtaining a job elsewhere due to his lack of schooling, and their belief that he does not know how to read or write to any degree and his lack of technical skills of any sort.*
>
> 6. State in detail your contention as the type of activities and movements that the Claimant is able to engage in, the type of activities and movements he is not able to engage in, and the facts upon which you base your contention.
>
> ANSWER: The Claimant was originally hired to perform a three-fold capacity for The Bullis School, namely as a janitor in the school buildings at night, as a bus driver and as a general maintenance man. *He is not capable of performing any of the above activities at this time in regards to the purposes for which he was hired and that he cannot move to scrub and wax floors, cannot drive a bus or tractor,*

*nor engage in any activity where it would require standing and the use of his injured leg.*" (Emphasis supplied).

Daniel Mauchline, a well qualified vocational and educational consultant in full time private practice, testified that in his expert opinion Justus was not "employable in a competitive industrial situation". When asked the basis for that opinion, he testified as follows:

"Q. What is the basis for your expert opinion that he is not employable in a competitive labor market? A. From a rehabilitative standpoint, you have to adopt a global view and we have a number of problems here not the least of which is physical problems. We have limited intellectual ability. We have illiteracy and extremely poor manipulative ability.

"We were to consider this gentlemen for secondary jobs, jobs which you can perform from an essentially seated position. What we have to do is to think in terms of clerical jobs, secondary fact jobs or related activities. Even the simplest clerical activities, by a combination of illiteracy and poor intellectual function, secondary fact work is ruled out because of the extremely poor manipulative ability which does not require a high degree of skill and is simply a job which has to be performed repetitively, rapidly and accurately. The measurements of the manipulative ability, it would be unreasonable to expect this individual to survive at such an occupation."

Mauchline further opined that in the Washington Metropolitan area "there is no market whatsoever" "for a person with Mr. Justus' limitations in the field of general maintenance and supervision work". He explained:

"Q. (By Mr. Rowan) What is the basis for that opinion? A. A general maintenance supervisor, number one, has to be capable of doing much of the work himself. He can't rely entirely on the

maintenance crew. They have normally a tremendous amount of turnover in these jobs.

\* \* \*

"The maintenance foreman will frequently have to go out and make plumbing repairs which would require kneeling, lying down on the floor. He would frequently have to climb ladders to replace light bulbs, repair window sashes. Additionally, in almost every instance, the maintenance supervisor will write out written work orders for the employees to follow when they do the job and return these when the job is done so there is evidence that things were repaired.

"We have here physical limitations which would proscribe the physical demands of the job and we have literacy problems which would obviate the possibility of preparing work orders."

We conclude that, even though the appellee was employed at the time of trial, the evidence as a whole, viewed in the light most favorable to the appellee, was legally sufficient for the jury to find that the 1973 accident caused him to be "so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist" and that, therefore, he comes within the legal definition of one who has suffered permanent total disability. *Babcock & Wilcox v. Steiner; Dent v. Cahill,* both *supra. See also Mureddu v. Gentile,* 233 Md. 216, 196 A. 2d 82 (1964), for the proposition that a scheduled loss of use, under Code (1957, 1964 repl. vol., 1976 cum. supp.), Art. 101, § 36 (3), may support a finding of permanent total disability under § 36 (1) of Art. 101, if the evidence is sufficient to show permanent total disability in fact.

### Testimony of Nontreating Physician

Dr. Gerald D. Schuster was called to testify on behalf of the appellee. Dr. Schuster had examined the appellee on two occasions prior to trial. On the ground that he was a

nontreating physician, appellants objected to the following question asked on direct examination: "Would you tell us the results of your examination starting with the chief complaints elicited from him?" After the objection was overruled, Dr. Schuster answered:

> "The patient was complaining about his right knee. He stated that he had constant pain in the knee. He also noted pain in the right hip. He stated that he walked with a limp, was fearful of putting weight on his knee as it had buckled on him a number of times and had locked on occasion. This occurred mostly when he was sitting down as well as being up on his feet. He stated he wore a knee cage most of the time. He has been unable to work at his regular job since the accident and has been doing some supervisory work."

Prior to the decision of the Court of Appeals in *Beahm v. Shortall*, 279 Md. 321, 368 A. 2d 1005 (1977), it was firmly established in this State that the testimony of a nontreating physician relating the "patient's" statements made to him concerning his symptoms and subjective complaints was inadmissible as a violation of the hearsay rule. *See Parker v. State*, 189 Md. 244, 249, 55 A. 2d 784 (1947); *Candella v. Subsequent Injury Fund*, 277 Md. 120, 123-124, 353 A. 2d 263 (1976).

In *Beahm*, the Court recognized the criticism of this restrictive "rule of *Parker*", decided not to adhere to it, and adopted the following more liberal rule:

> "We hold that a physician, who examines a patient, not for the purpose of treatment, but in order to qualify as an expert witness, may present his medical conclusions and the information, including the history and subjective symptoms, received from the patient which provide the basis for the conclusions. The conclusions are admissible as substantive evidence. The statements made by the patient as narrated by the physician, are admissible, with a qualifying charge to the jury,

only as an explanation of the basis of the physician's conclusions and not as proof of the truth of those statements." *Id.* at 327.

Because Dr. Schuster's testimony concerning the appellee's subjective symptoms was in fact admitted without an appropriate explanatory instruction, it was before the jury as substantive evidence, and, therefore, its admission was erroneous. *Beahm v. Shortall, supra,* 329. The appellee argues, however, that "no reversible error" was committed. We agree. The error was harmless. Evidence that the appellee suffered from the disabilities he related to the doctor was properly before the jury apart from the testimony of the doctor himself. Other witnesses, including the appellee himself, testified about them. It is manifest, therefore, that the doctor's testimony that was admitted in error did not significantly affect the interests of the appellants. As said by Judge Orth, who spoke for the Court of Appeals in *Beahm,* a case involving similar circumstances, "It was not 'substantially injurious' so as to have a prejudicial effect on the outcome of the case. In other words, the error was harmless in the circumstances" and "does not warrant reversal [Citations omitted.]". *Id.,* at 332.

### Testimony of Nontreating Vocational Rehabilitation Expert

Appellants next contend that the trial court committed reversible error in allowing the testimony of Mr. Daniel Mauchline, a nontreating vocational rehabilitation expert. Our consideration of this testimony in resolving appellants' first question (the propriety of denial of appellants' motion for a directed verdict) evidences our disagreement with appellants' contention that the evidence was improperly received.

Appellants advance two arguments in support of their contention that Mr. Mauchline's testimony was improperly admitted. First, citing *Jewel Tea Co. v. Blamble,* 227 Md. 1, 174 A. 2d 764 (1961), they contend that the case "involves complicated medical questions which fall squarely within the providence [sic] of medical experts". From this, they deduce that the testimony is inadmissible. Second,

appellants contend that **Mr. Mauchline's** testimony "should have been excluded under the rule enunciated in *Candella v. Subsequent Injury Fund, supra*". We find both arguments unpersuasive.

(1)

In *Jewel Tea Co. v. Blamble, supra,* the Court of Appeals stated:

> "It has been held that reliance on lay testimony *alone* is not justified when the medical question involved is a complicated one, involving fact finding which properly falls within the province of medical experts. [citations omitted]." *Id.* at 7 (emphasis supplied).

From this statement appellants conclude that as this case involves complicated medical questions, nonmedical testimony is *inadmissible.* Such a conclusion is supported neither by the holding in *Jewel Tea* nor any language contained therein. In *Jewel Tea* the Court of Appeals held that:

> "In the absence of more compelling proof than the opinion of the employee herself and that of her landlady that she is totally disabled within the intendment of the statute, and in the light of medical opinion to the contrary, we must hold that the trial court erred in refusing to grant the appellant's prayer [requesting the court to instruct the jury that from the uncontradicted evidence it could not find that appellee was one hundred percent disabled]." *Id.* at 8.

Thus, the holding in *Jewel Tea* went to the sufficiency of the evidence to support a requested instruction and not to the admissibility of any of that evidence. Although the Court in *Jewel Tea* held expert testimony "determinative", *id.* at 7, it did not hold lay testimony inadmissible. Rather, it considered such lay testimony in reaching its conclusion that the trial court erred in refusing to grant the appellant's prayer.

Even the language in *Jewel Tea* relied upon by appellants does not support their argument. While the Court in *Jewel Tea* stated "that reliance on lay testimony *alone* is not justified when the medical question involved is a complicated one," *id.,* at 7 (emphasis supplied), that does not mean that nonmedical testimony is thereby rendered inadmissible. That quoted passage merely indicates that when the medical question involved is a complicated one, lay testimony alone, *although properly* admissible, is not sufficient to overcome uncontradicted medical testimony to the contrary.

The fallacy of appellants' argument is demonstrated by the definition of total disability approved by the Court of Appeals, *see Babcock & Wilcox, Inc. v. Steiner, supra; Dent v. Cahill, supra*:

> " 'An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a *reasonably stable market* for them does not exist, may well be classified as totally disabled.' (*Lee v. Minneapolis St. Ry.*, 230 Minn. 315, 41 N.W. 2d 433, 436 (1950)." *Dent v. Cahill, supra*, at 127 (emphasis supplied).

This test contemplates, if not requires, testimony such as that given here by Mr. Mauchline concerning whether or not a reasonably stable market exists for the services an individual is capable of performing after the injury. Appellants' contention that such testimony is inadmissible was effectively disposed of in the case from which Maryland's definition of permanent total disability was extracted: *Lee v. Minneapolis Street Ry., supra*. In *Lee* the Supreme Court of Minnesota stated:

> "If reasonably stable employment is not available for an employe by reason of certain injuries which have crippled him physically or neurologically, evidence of that fact — through the testimony of an experienced employment supervisor — is both material and relevant in determining whether the

employe's disability is of such a character that he has no reasonable likelihood, *while such disability continues*, of being able to obtain and pursue an income-yielding occupation with reasonable continuity as contemplated by M.S.A. § 176.11, subd. 5. *See, Baker v. MacGillis Gibbs Co.*, 222 Minn. 460, 25 N.W.2d 219. The purpose of the testimony is not to establish the nature of the disability or its duration, but to determine, assuming the existence of certain injuries, whether employment is available for a person so handicapped." 41 N.W. 2d at 436 (emphasis in original).

Other jurisdictions adopting the rule enunciated in *Lee v. Minneapolis Street Ry.* have held expert testimony as to the availability of a reasonably stable market for the injured party's services admissible. *See e.g., Defense Ordinance Corp. v. England*, 52 Ala. App. 565, 295 So. 2d 419 (1974); *Ady v. Director*, 513 P. 2d 1085 (Col. App. 1973); *Fochtman v. Dept. of Labor and Industries*, 7 Wash. App. 286, 499 P. 2d 255 (1972); *Millender v. City of Carrabelle*, 174 So. 2d 740 (Fla. 1965). Finally, in *Consolidated Mechanical Contractors, Inc. v. Ball*, 263 Md. 328, 338-39, 283 A. 2d 154 (1971), the Court of Appeals held testimony of a rehabilitation expert which reflected the inability of claimant to obtain work admissible.

For these reasons, we hold that the lower court was correct in not excluding Mr. Mauchline's testimony merely because he was not a medical expert.

### (2)

Appellants next contend that Mr. Mauchline's opinion testimony was based on the inadmissible history he took from appellee, evidence he heard in court, and a report (not in evidence) furnished him by a nontreating physician, and, therefore, it "should have been excluded under the rule enunciated in *Candella v. Subsequent Injury Fund, supra,* [the *Parker* rule]". As previously noted, however, the Court of Appeals in *Beahm v. Shortall, supra,* declined to follow

the rule of *Parker* and adopted the rule heretofore set forth in this opinion.

Whether the rule of *Beahm* is applicable to a nontreating vocational rehabilitation expert we need not decide today.[1] Even under the more restrictive rule of *Parker*, as reiterated in *Candella*, an expert opinion based on evidence heard in court is not inadmissible. Here, the record reflects that Mr. Mauchline had heard the entire testimony in the case at the time he testified. In *Consolidated Mechanical Contractors, Inc. v. Ball*, 263 Md. 328, 283 A. 2d 154 (1971), the Court of Appeals, in upholding the admissibility of testimony of a vocational rehabilitation counselor, stated:

> "But it is true also that an expert witness who has heard the entire testimony in a case and who assumes the truth of it all, where it is not conflicting, may base his opinion upon *facts* testified to by other witnesses, or upon *facts* contained in reports or examinations made by third parties. [citations omitted]." *Id.* at 335 (emphasis in original).

The only questions propounded to Mr. Mauchline indicating what information he relied on for his opinion are as follows:

> "Q. As a result of administering the tests that you administered and of taking the history that you did and hearing the testimony here in the courtroom which has preceded you, which I ask you to assume as accurate, do you have an opinion within a reasonable degree of probability in the field of vocational and educational rehabilitation as to whether or not Mr. Justus is permanently and totally disabled from an industrial employment in the competitive labor market?"

> \* \* \*

> "Q. Is your opinion that you have expressed in

---

[1]. The Court of Appeals has stated, however, that it has never treated expert medical testimony any differently than other types of expert testimony. Radman v. Harold, 279 Md. 167, 171, 367 A. 2d 472 (1977).

your testimony based upon your examination and the tests you have administered and the facts you have heard elicited here in the courtroom?"

His answer to both questions was in the affirmative. It is thus apparent from Mr. Mauchline's testimony that his opinions were based upon the history he took from appellee, certain tests he performed on appellee, and uncontradicted testimony which he heard at trial and assumed to be accurate. Even if appellants were correct in their assertion that Mr. Mauchline relied on the report of a nontreating physician in forming his opinion, we find apposite what was further stated in *Consolidated Mechanical Contractors, Inc. v. Ball, supra,* at 338-39:

"Tich [the vocational rehabilitation counselor] was not asked to give an opinion in respect of [the appellee's] *medical* disability. It is true, of course, that he had access to and perhaps he made use of information from medical reports, as well as other sources. Additionally he was able to consult with Ball and to subject him to certain tests. His opinion may well be the result of a careful screening of all of the available evidence, not merely the evaluation of an assortment of medical records. His testimony reflects also the inability of Ball to obtain employment. His position in the Division of Vocational Rehabilitation and the length of his service ought to qualify him to testify as he did and we see no reason why he should be obliged to disregard the medical evidence when such evidence, at least to some extent, seems to be relied upon by people in his specialty. Nor are we persuaded that the reports, whether in evidence or not, are unreliable as hearsay evidence. In the main they are uncontradicted." (Emphasis in original).

Assuming without deciding that it was error to have allowed Mr. Mauchline to testify concerning the "history" he received from the appellee, the error was harmless, for as with the history received by the nontreating physician, Dr.

Schuster, the same evidence was properly before the jury apart from Mr. Mauchline's testimony. Mr. Mauchline testified that the "history" he received "was as detailed a work history as I could get to determine the source of jobs he had done in the past". The appellee himself had previously testified, without objection, to essentially just that.

For the foregoing reasons, we perceive no reversible error in Judge Mitchell's rulings concerning Mr. Mauchline's testimony.

### Instructions

Judge Mitchell instructed the jury on the issue of permanent total disability as follows:

> "You are instructed that permanent total disability means incapacity to do work of any kind and not merely the incapacity to perform that work which the employee was accustomed and qualified to perform before the injury. However, permanent total disability is not to be interpreted literally as utter and abject helplessness.
>
> Evidence that the claimant has been able to earn occasional wages or perform certain kinds of gainful work does not necessarily rule out a finding of permanent total disability. An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist may be classified as permanently and totally disabled."

Appellants, while agreeing that "the instruction encompasses the definition enunciated in *Babcock & Wilcox, Ind. v. Steiner*", *supra,* contend that "it did not apply to the factual situation as presented by the appellee's own testimony". For the reasons already discussed in considering the appellants' first question in this appeal, the contention is without merit.

*Judgment affirmed.*
*Costs to be paid by appellants.*